# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# JONESBORO DIVISION

CLARENCE THOMASON                                                                                   PLAINTIFF

v.                                       NO. 3:14-cv-00303 PSH

CAROLYN W. COLVIN, Acting Commissioner                                                    DEFENDANT
of the Social Security Administration

## MEMORANDUM OPINION AND ORDER

Plaintiff Clarence Thomason ("Thomason") commenced the case at bar by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, he challenged the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon findings made by an Administrative Law Judge ("ALJ").

Thomason maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole and offers several reasons why.[1] Thomason maintains, inter alia, that his residual functional capacity was not properly assessed. His explanation for why is not a model of clarity, but it appears to be centered upon the lack of medical evidence to support the assessment.

---

[1] The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

The medical evidence reflects that Dr. Roger Cagle, M.D., ("Cagle") began seeing Thomason in November of 2003 for his complaints of, <u>inter alia</u>, back, knee, and ankle pain. <u>See</u> Transcript at 442. In February of 2009, Cagle referred Thomason to Dr. Dewayne Eubanks, M.D., ("Eubanks") for an evaluation of Thomason's pain. <u>See</u> Transcript at 252-258. Thomason reported that he was seventy-three inches tall and 360 pounds. Eubanks characterized Thomason as "super morbid obese." <u>See</u> Transcript at 253. Testing revealed significant degenerative disc disease at L4-L5 and L2-S1. Eubanks diagnosed, <u>inter alia</u>, super morbid obesity with chronic low back pain and left meralgia paresthetica. Eubanks noted that Thomason was not "hurting enough that he would pursue surgery. <u>See</u> Transcript at 252. Eubanks noted, though, that if Thomason's pain continued, surgery should be considered.

In March of 2009, Cagle referred Thomason to Dr. Calin Savu, M.D., ("Savu") for pain management. <u>See</u> Transcript at 262-264. Savu observed, <u>inter alia</u>, that Thomason had "obvious difficulties with mobilization," a "stiff gait with a wide base," and "difficulty standing up," but had no cyanosis, clubbing, or edema in his extremities. <u>See</u> Transcript at 263. Testing of Thomason's lumbar spine revealed "[m]ild central spinal stenosis at L4-L5" and "[c]hronic degenerative disc desiccation and posterior facet joint arthropathy at multiple levels, L2-S1." <u>See</u> Transcript at 259. Savu performed medial branch blocks and a "radiofrequency neurotomy." <u>See</u> Transcript at 269. Savu observed that Thomason's pain prevented him from receiving physical therapy, but he did report excellent results from the treatment he received. <u>See</u> Transcript at 265.

Cagle thereafter saw Thomason for his complaints of, inter alia, back, knee, and ankle pain on what appears to have been at least fourteen occasions between October of 2009 and February of 2012. See Transcript at 331-332 (10/11/2009); 335-336 (11/30/2009); 338-339 (12/23/2009); 341-342 (01/25/2009); 344-346 (03/10/2010); 347-349 (04/19/2010); 350-351 (05/17/2010); 352-354 (05/05/2011); 355-358 (06/21/2011); 359-361 (11/10/2011); 362-364 (11/15/2011); 465-467 (12/15/2011); 469-471 (01/10/2012); 472-475 (02/18/2012). Cagle's progress notes reflect that Thomason weighed at times as little as 303 pounds, see Transcript at 355, but at other times weighed as much as 357 pounds, see Transcript at 331. Cagle repeatedly observed that despite Thomason's excessive weight and complaints of pain, he was generally able to do "usual activities," had a good exercise tolerance, and had no pain in his legs from walking. See Transcript at 344-345, 347-348, 350-351, 352-353, 355-356, 359-360, 362-363, 462-463, 465-466, 470, 472-474. Cagle also repeatedly observed that Thomason had a normal gait, normal motor function, a normal range of motion in all of his extremities, and a normal range of motion in his spine, although Cagle repeatedly noted that Thomason's knees were "puffy with soreness" and he had a sore low back with "paraspinous [muscle] tenderness." See Transcript at 344, 347, 350, 352-353, 356, 360, 362-363, 466, 470, 474. Cagle repeatedly assessed, inter alia, back pain associated with lumbar disc disease, osteoarthrosis, chondromalacia, diabetes mellitus, and obesity, see Transcript at 332, 336, 339, 342, 345, 348, 351, 353, 356, 360, 363, 466, 470, 474, and prescribed medication.

In February of 2012, Cagle prepared a document captioned "multiple impairment questionnaire" on behalf of Thomason. See Transcript at 442-449. In the document, Cagle set forth his diagnoses of Thomason's impairments, e.g., degenerative disc disease and arthritis, and the findings and test results supporting the diagnoses. Cagle estimated Thomason's level of pain as being between six and seven on a ten point pain scale and estimated his level of fatigue as being between seven and eight on a ten point fatigue scale. Cagle estimated Thomason's residual functional capacity to be as follows:

    1) Thomason could sit for between two to three hours in an eight hour workday but could not do so continuously;

    2) he could stand/walk for one to two hours in an eight hour workday but could not do so continuously;

    3) he could frequently lift and carry up to five pounds, could occasionally lift and carry between five to twenty pounds, but could never lift and carry more than twenty pounds;

    4) he has significant limitations in doing repetitive reaching, handling, fingering, or lifting; and

    5) he has moderate to marked limitations in grasping, turning, and twisting objects, using his fingers/hands for fine manipulations, and using his arms for reaching.

Cagle opined that Thomason's symptoms would likely increase if he were placed in a competitive work environment.

The record reflects that Dr. Kevin Ganong, M.D., ("Ganong") saw Thomason on several occasions between December of 2005 and June of 2013 for his diabetes. See Transcript at 579-580 (12/01/2005), 384-386 (12/30/2010), 382-383 (02/14/2011), 380-381 (08/16/2011), 378-379 (11/16/2011), 530-531 (02/04/2013), 528-529 (02/20/2013), 526-527 (05/22/2013), 523-524 (06/05/2013). In December of 2010, Ganong noted that Thomason's diabetes was uncontrolled despite taking medication, but Ganong also noted that Thomason "is able to function fairly well without the pain medication as he works standing up on a forklift for 10-12 hours at a time." See Transcript at 384. Ganong's subsequent progress notes are largely unremarkable. For instance, although Ganong continued to note that Thomason's diabetes caused numbness and pain, he reported that it was controlled by medication, see Transcript at 378, and Ganong noted that Thomason could exercise "as tolerated," see Transcript at 527.

In June of 2013, Ganong prepared a "multiple impairment questionnaire" on behalf of Thomason. See Transcript at 533-540. In the document, Ganong set forth his diagnoses of Thomason's impairments, e.g., diabetes and obesity, and the findings and test results supporting the diagnoses. Ganong estimated Thomason's level of pain as being six on a ten point pain scale and estimated his level of fatigue as being five on a ten point fatigue scale. Ganong estimated Thomason's residual functional capacity to be as follows:

    1) Thomason could sit for two hours in an eight hour workday but could not do so continuously;

    2) he could stand/walk for no more than one hour in an eight hour

workday but could not do so continuously;

3) he could frequently lift and carry no weight, could occasionally lift and carry up to twenty pounds, but could never lift and carry more than twenty pounds;

4) he has significant limitations in doing repetitive reaching, handling, fingering, or lifting; and

5) he has moderate to marked limitations in grasping, turning, and twisting objects, using his fingers/hands for fine manipulations, and using his arms for reaching.

Ganong opined that Thomason's symptoms would likely increase if he were placed in a competitive work environment.

Dr. Sharon Keith, M.D., ("Keith") reviewed Thomason's medical records and offered an assessment of his residual functional capacity. See Transcript at 430-437. Keith opined that Thomason could perform a reduced range of sedentary work. Keith's assessment was later affirmed by Dr. Patricia McCarron, M.D. See Transcript at 503.

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of "the most a person can do despite that person's limitations." See Brown v. Barnhart, 390 F.3d 535, 538-39 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record, but the assessment must be supported by some medical evidence. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010).

As a part of assessing the claimant's residual functional capacity, the ALJ is

required to evaluate the medical opinions in the record. See <u>Owens v. Astrue</u>, 551 F.3d 792 (8th Cir. 2008). A treating physician's medical opinions are given controlling weight if they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence. See <u>Choate v. Barnhart</u>, 457 F.3d 865 (8th Cir. 2006). The ALJ may discount a treating physician's medical opinions if other medical assessments are supported by more thorough medical evidence or where a treating physician renders inconsistent opinions. See <u>Id</u>. The opinions of a non-treating, non-examining physician are not accorded such weight. See <u>McCoy v. Astrue</u>, 648 F.3d 605 (8th Cir. 2011) (opinions by non-treating, non-examining physician given less weight than opinions by treating physician).

The ALJ considered Cagle and Ganong's opinions in assessing Thomason's residual functional capacity. With respect to the opinions, the ALJ found the following:

> The undersigned has considered the opinion from Dr. Cagle, claimant's treating physician, dated February 18, 2012, that the claimant could not do a full-time competitive job on a sustained basis … However, the record notes that the claimant was not treated by Dr. Cagle between March 2010 and May 2011 … In addition, the record[] indicate[s] that Dr. Cagle treated the claimant's symptoms very conservatively with medication only. Thus, the course of treatment pursued by the doctor has not been consistent with what one would expect if the claimant were truly disabled, as the doctor has reported. Hence, it is permissible for an Administrative Law Judge to discount an opinion of a treating physician that is inconsistent with the physician's own clinical treatment notes … Therefore, the expressed opinion of Dr. Cagle is not fully supported by the weight of substantial evidence and as such is not entitled to controlling weight on the issue of disability.
> Furthermore, the undersigned has considered the opinion of Dr. Ganong, claimant's treating endocrinologist, dated June 5, 2013, that the claimant

> could not do a full-time competitive job on a sustained basis … Dr. Ganong noted on November 16, 2011, that the claimant reported improved control of his type II diabetes since restarting his medication on August 16, 2011 … Yet, in several visits to Dr. Ganong, the claimant reported that he had run out of medication; even though he knew it controlled his diabetes. In addition, the record notes that the claimant was not treated by Dr. Ganong between November 2011 and February 4, 2013 … Thus, the course of treatment pursued by the claimant has not been consistent with what one would expect if the claimant were truly disabled, as the doctor has reported. Accordingly, although the doctor does have a treating relationship with the claimant, the record reveals that actual treatment visits had been relatively infrequent up to four months before the disabling opinion was given. Therefore, the expressed opinion of Dr. Ganong is not fully supported by the weight of substantial evidence and as such is not entitled to controlling weight on the issue of disability.

See Transcript at 52. The ALJ also considered the opinions of the state agency physicians in assessing Thomason's residual functional capacity and gave the opinions "some weight." See Transcript at 52. The ALJ found that Thomason retains sufficient residual functional capacity to perform a reduced range of sedentary work.

The question for the Court is whether substantial evidence on the record as a whole supports the ALJ's findings. Although Thomason bears the burden of proving his residual functional capacity, which is an administrative determination reserved for the ALJ, see Cox v. Astrue, 495 F.3d 614 (8th Cir. 2007), there must be some medical evidence to support the assessment. On the record now before the Court, it cannot be said that the assessment of Thomason's residual functional capacity is supported by some medical evidence.

The Court acknowledges being troubled by the fact that not one but two treating

physicians found Thomason to have severe limitations. Cagle and Ganong agreed that Thomason's abilities to sit, stand/walk, lift/carry, and perform manipulative functions are severely limited. For instance, they generally agreed that he could sit for two to three hours in an eight hour workday but could not do so continuously. It is difficult to see how Cagle and Ganong could have arrived at similar conclusions unless Thomason has severe limitations. The role of the ALJ, though, is not to count the number of medical opinions and decide the case on the basis of the number of opinions supporting a side; instead, the ALJ must evaluate the evidence and decide the case on the basis of all the evidence in the record.

Notwithstanding the foregoing, the ALJ could and did discount Cagle and Ganong's opinions because they are inconsistent with their progress notes. For instance, Cagle repeatedly assessed, <u>inter alia</u>, back pain associated with lumbar disc disease, osteoarthrosis, chondromalacia, diabetes mellitus, and obesity. He nevertheless observed that Thomason was generally able to do "usual activities," had a good exercise tolerance, and had no pain in his legs from walking. Although Ganong repeatedly assessed diabetes and obesity, he recorded Thomason's reports that his diabetes was at times controlled by medication and noted that he could exercise "as tolerated." Given Cagle and Ganong's largely unremarkable findings in their progress notes, it is difficult to see how the physicians could have opined that Thomason has severe limitations in his abilities to sit, stand/walk, lift/carry, and perform manipulative functions.

Having discounted Cagle and Ganong's medical opinions, what medical evidence

supports the ALJ's assessment of Thomason's residual functional capacity? It appears that the ALJ made his assessment on the basis of the opinions offered by the state agency physicians and on the basis of his interpretation of the record. The ALJ's reliance upon that evidence alone was erroneous.

First, the findings of the state agency physicians offer very little insight into the most Thomason can do despite his limitations. The state agency physicians are consultants who never examined Thomason; they simply reviewed his medical records and offered brief opinions as to his residual functional capacity. It is also worth noting that the ALJ gave their opinions "some weight" despite discounting their opinions to some degree because he found that Thomason has greater work-related limitations than they found.[2]

Second, it appears that the ALJ impermissibly drew his own inferences about the severity of Thomason's impairments from the progress notes in the record, including those compiled by Cagle and Ganong. See Shontos v. Barnhart, 328 F.3d 418 (8th Cir. 2003) (ALJ cannot draw own inferences from records). The Court cannot tell what the ALJ relied upon in the various progress notes to cause him to find that Thomason can perform a reduced range of sedentary work.

It is for the foregoing reasons that substantial evidence on the record as a whole

---

[2]

Specifically, the ALJ found the following: "[t]he residual functional capacity conclusions reached by [the state agency physicians], employed by the State Disability Determination Services, also supported a finding of "not disabled," although the [ALJ] finds that the claimant is somewhat more limited than he was previously assessed to be." See Transcript at 52.

does not support the ALJ's assessment of Thomason's residual functional capacity. A remand is therefore necessary. Upon remand, the ALJ shall re-assess Thomason's residual functional capacity. As a part of doing so, the ALJ shall re-evaluate the medical evidence and, if necessary, send Thomason for a consultative examination.

The Commissioner's decision is reversed, and this case is remanded. The remand in this case is a "sentence four" remand as that phrase is defined in 42 U.S.C. 405(g) and <u>Melkonyan v. Sullivan</u>, 501 U.S. 89 (1991). Judgment will be entered for Thomason.

IT IS SO ORDERED this 7th day of October, 2015.

_____
UNITED STATES MAGISTRATE JUDGE